**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6449
jpafiti@pomlaw.com

*(additional counsel on signature page)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WEISMANN, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| vs. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| STITCH FIX, INC., KATRINA LAKE, PAUL YEE and MIKE C. SMITH, | |
| Defendant(s) | DEMAND FOR JURY TRIAL |

Plaintiff Steven Weismann ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stitch Fix, Inc. ("Stitch Fix" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of Stitch Fix common stock between June 8, 2018 and October 1, 2018, inclusive (the "Class Period") seeking remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Stitch Fix is an online retail fashion subscription service. Stitch Fix purchases clothing, shoes and accessories from name-brand manufacturers and designs more in-house that it has manufactured. Stitch Fix personnel then select and deliver curated boxes of items to "clients" to try on, buy what they like, and return the rest. While some or all of the items can be returned free of charge, clients are incentivized to accept the entire selection through a 25% price discount that is only applied if the client accepts the entire shipment.

3.      Beginning in 2017, the Company started to advertise its services on television, which attributed to its considerable active client growth during 2017 and 2018. For investors in Stitch Fix, reported active clients is a key metric for them to value the Company and make investment decisions.

4.      When the Company was marketing its IPO in November 2017, it specifically touted that its active client base had grown from 867,000 at August 1, 2015, to 1,674,000 at July 30, 2016, to 2,194,000 at July 29, 2017, representing year-over-year growth rates of 93.1% and 31.1%, respectively.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) its active client growth was weakening; (2) the Company would cease its investment in television advertising; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On October 1, 2018, after the close of trading, Stitch Fix reported its 4Q18 financial results, which fell short of projected active client growth expectations, disclosing that the Company had signed up far fewer than expected new active clients during 4Q18, which had ended more than two months earlier, on July 28, 2018. The Company reported that its active client count was virtually flat, and that its active client growth had declined by 70% quarter-over-quarter.

7.      On this news, the price of Stitch Fix common stock fell $15.69 per share, greater than 35%, to close at $31.58 per share on October 2, 2018.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.      Venue is proper in this District pursuant to §27 of the Exchange Act, as Stitch Fix is headquartered in this District and many of the false and misleading statements alleged herein were disseminated from this District.

11.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

12.     Plaintiff purchased Stitch Fix common stock during the Class Period, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.

13.     Defendant Stitch Fix is a San Francisco, California-based online purveyor of clothing and accessories. Stitch Fix common stock is listed and trades on the NASDAQ, an active market, under the ticker symbol "SFIX.".

14.     Defendant Katrina Lake ("Lake") is, and was at all relevant times, the founder, Chief Executive Officer ("CEO") and a director of Stitch Fix.

15.     Defendant Paul Yee ("Yee") is, and was at all relevant times, the Chief Financial Officer of Stitch Fix.

16.     Defendant Mike C. Smith ("Smith") is, and was at all relevant times, the Chief Operating Officer of Stitch Fix.

17.     The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Stitch Fix sells a range of apparel, shoes, and accessories through its Website and mobile app in the United States. It offers denim, dresses, blouses, skirts, shoes, jewelry, and handbags for men, women, and kids under the Stitch Fix brand. The Company was formerly known as rack habit inc. and changed its name to Stitch Fix, Inc. in October 2011.

### Defendants' False And Misleading Statements During The Class Period

20.     The Class Period starts on June 8, 2018. On June 7, 2018, after the close of trading, Stitch Fix issued a press release and letter to shareholders announcing its 3Q18 financial results for the period ended April 28, 2018. The press release emphasized that Stitch Fix had experienced growth in active clients, to 2.7 million, an increase of 30% year over year:[1]

**Stitch Fix Announces Third Quarter Fiscal 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for its third quarter of fiscal year 2018 ended April 28, 2018 and posted a letter to its shareholders on its investor relations website. Highlights include delivering:

Active clients of 2.7 million, an increase of 30% year over year Net revenue of $316.7 million, an increase of **29% year over year** Net income of $9.5 million and adjusted EBITDA of $12.4 million Diluted earnings per share of $0.09

"In addition to driving strong net revenue, net income, and adjusted EBITDA, **we grew our active client count to 2.7 million, an increase of 30% year-over-year,**" said Stitch Fix founder and CEO Katrina Lake. **"We continue to balance growth and profitability, demonstrated by our ability to consistently deliver top-line growth** of over 20% even as we invest in category expansions, technology talent, and marketing. **Our third quarter results demonstrate continued positive momentum** for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

---

[1]  Unless otherwise noted, emphasis added throughout.

21.    The shareholder letter, which was posted on the Company's website and filed with the SEC, repeated Stitch Fix's claim that it had "[grown] active clients to 2.7 million as of April 28, 2018," from 2.5 million in 2Q18, and from 2.07 million in 3Q17, an increase of 614,000 and 29.6% year-over-year growth.

22.    The 3Q18 shareholder letter further stated that the Company's "Q3'18 advertising spend," which it said then included "the costs associated with the production of advertising, television, radio and online advertising," had "increased relative to [its] Q3'17 expense [to] 8.7% of net revenue." It also stated that the Company "continue[s] to make strategic and measured marketing investments designed to achieve near-term payback."

23.    Stitch Fix conducted a conference call with investors later that afternoon hosted by defendants Lake, Yee and Smith during which they provided additional positive commentary about the Company's 3Q18 financial results and its purportedly ongoing strong business metrics and financial prospects.

24.    On the call, Defendant Lake stated that Stitch Fix had grown its "active client count to 2.7 million as of April 28, 2018, an increase of 614,000 and 30% year over year," and that the "Q3 also marked the fifth consecutive quarter of over 20% year over year top-line growth." She went on to emphasize that Stitch Fix had *"significant opportunities to acquire new clients in [its] existing business," and that the "30% year-over-year growth [it had] seen in active client count [was] the result of [efforts to serve new client groups], efficiently leveraging [its] performance marketing capabilities and increasing [its] brand awareness."*

25.    Later on the same call, Defendant Lake stated that the Company's new Men's and Plus-sized client offerings was having on the growth of active clients, and that for "Plus directionally," there were "75,000 . . . people that were waiting on the wait list before [they] even launched the business,"

and though she stated Stitch Fix "[would not] be providing the exact numbers, the number of people that [were] benefiting from that service [was] significantly higher than that and *certainly continue[d] to grow."* She also emphasized that "from a category perspective, Men's [and] Plus size . . . are all great opportunities for us to be able to have *many, many paths for long-term growth."*

26.    Asked which categories of active clients were providing Stitch Fix with the confidence to provide the strong 4Q18 financial guidance announced that day, defendant Yee responded that, "from a driver's standpoint, we grew active clients by 30% year-over-year, and that's both for our Women's and Men's categories," adding that the Company was "really pleased with efficiencies . . . seen with [its] marketing spend to attract new clients as well as ability to reengage and engage clients with the various tools . . . to really please [its] clients."

27.    On the same day, after the Company's reported its financial results, CNBC aired a segment and published an article repeating Lake's claims of continuing positive momentum in scaling the Company's business:

> Stitch Fix soared after the company reported strong earnings and user growth on Thursday.
>
> Here's how the company did compared to what Wall Street expected:
>
> - Earnings: 9 cents vs. 3 cents forecast by Thomson Reuters
>
> - Revenue: $316.7 million vs. $306 million forecast by Thomson Reuters
>
> - Active clients: 2.7 million vs. 2.66 million forecast by StreetAccount
>
> In the year-ago quarter, Stitch Fix reported a loss per share of 38 cents on $245.1 million in revenue.
>
> *        *        *
>
> Founder and CEO Katrina Lake said the company has been able to post revenue growth without sacrificing investment in the business.

*"Our third quarter results demonstrate continued positive momentum for Stitch Fix* and the power of our unique ability to deliver personalized service at scale," Lake said in a statement.

28.     On June 8, 2018, Stitch Fix filed its 3Q18 quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Lake and Yee. The Management's Discussion and Analysis ("MD&A") section of the Form 10-Q contained the following discussion of Stitch Fix's active client growth, which the Form 10-Q emphasized was a "key indicator of growth and the overall health of [the Company's] business," stating in pertinent part as follows:

*Active Clients*

*We believe that the number of active clients is a key indicator of our growth and the overall health of our business.* We define an active client as a client who checked out a Fix in the preceding 12-month period, measured as of the last date of that period. A client checks out a Fix when she indicates what items she is keeping through our mobile application or on our website. *We had 2,688,000 and 2,074,000 active clients as of April 28, 2018 and April 29, 2017, respectively, representing year-over-year growth of 29.6%.*

29.     Detailing the "Factors Affecting [its] Performance," the MD&A section of Stitch Fix's 3Q18 Form 10-Q further emphasized the Company's ongoing active customer growth success and how its marketing spend was contributing to that growth, stating in pertinent part as follows:

*Client Acquisition and Engagement*

To grow our *business*, we must continue to acquire clients and successfully engage them. We believe that implementing broad-based marketing strategies that increase our brand awareness has the potential to strengthen Stitch Fix as a national consumer brand, *help us acquire new clients* and drive revenue growth. As our business has achieved a greater scale and we are able to support a large and growing client base, *we have increased our investments in marketing to take advantage of more marketing channels to profitably acquire clients.* For example, *we recently significantly increased our advertising spend, from $21.3 million and $46.8 million for the three and nine months ended April 29, 2017 to $25.2 million and $73.2 million for the three and nine months ended April 28, 2018, respectively, to support the growth of our business. We expect to continue to make significant marketing investments to grow our business*. We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients. *Our current marketing efforts include* client

referrals, affiliate programs, partnerships, display advertising, **television**, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns.

30.     The 3Q18 Form 10-Q stated, in relevant part, that "[r]evenue increased by $71.7 million and $189.4 million, or 29.2% and 26.3% during the three and nine months ended April 28, 2018 compared with the same periods last year," noting "[t]he increase in revenue was primarily attributable to a 29.6% increase in active clients from April 29, 2017 to April 28, 2018, which drove increased sales of merchandise."

31.     Moreover, the 3Q18 Form 10-Q emphasized the importance of the television advertising campaigns to Stitch Fix's sales and promotional efforts, stating that because its "continued growth depend[ed] on attracting new clients," "[s]tarting in calendar year 2017, [it] began to increase [its] paid marketing expenses by investing more in digital marketing and launching [its] first television advertising campaigns." The Form 10-Q also expressly stated that the Company then "expect[ed] to increase [its] spending on these and other paid marketing channels in the future."

32.     On June 19, 2018, CNBC published another article discussing the Company's 3Q18 earnings report titled "Trader: this company could be the Netflix of apparel." The article emphasized the Company's reported 30% year-over-year subscriber growth:

**Trader: this company could be the "Netflix of apparel"**

- Josh Brown, Ritholtz Wealth Management CEO, bought Stitch Fix.

- It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report"

- ***The company topped Q3 analyst estimates when it reported earnings on June 7, and noted that active clients grew 30% compared to a year earlier.***

On Monday Ritholtz Wealth Management CEO and "Halftime Report" trader Josh Brown bought Stitch Fix since he believes it could become the "Netflix of apparel."

The San Francisco-based company is a clothing subscription service. Users fill out a style profile online and then receive a package with personally-curated clothing and accessories from the company. Subscribers can decide what they would like to buy from the box, and they can return the remaining items free of charge.

As e-commerce growth accelerates and traditional retailers struggle to keep up, Brown believes Stitch Fix could be a bright spot in the sector.

"If you look at the trouble the apparel companies have had building an online business fast enough to offset the decline in foot traffic Stitch Fix might be an answer," he said on Monday's "Halftime Report." "It may become the Netflix of apparel."

***Brown also likes the fundamentals of the company. He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue. "I think they found a way to build a business in apparel online that just absolutely delights their customers," he said.***

Stitch Fix went public on November 17, 2017, and shares are up 81% since through Monday's close. ***The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier. The stock has soared 33% since the company announced results.*** As the market continued to digest the impact of the Company's reported 3Q18 growth and the continuing momentum that it purported to represent, the price of the Company's stock increased to a Class Period high of $51.19 per share on September 17, 2018.

33.     On July 15, 2018, defendant Lake presented for Stitch Fix on NBC's Today show. A video link to the segment remained on the Company's website throughout the Class Period. Lake explained how she had launched Stitch Fix with just 29 customers, with NBC digitally displaying the number rapidly growing to 2.7 million active clients. As a result, it was stated that Stitch Fix was then "worth about two billion dollars." Asked whether business had been negatively impacted by the new Amazon.com Prime Wardrobe service rolled out earlier in 2018, which similarly "ship[s] customers clothes to try before they buy," Lake claimed that it had not impacted the business, emphasizing that "[t]he hardest part is that there's a million pairs of jeans out there literally and which ones are going to be the best ones for your body. And that's actually the hardest part to solve and we don't see anybody else doing that."

34.     The statements referenced in ¶¶ 20-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) its active client growth was weakening; (2) the Company would cease its investment in television advertising; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins To Emerge

35.     The truth concerning the Company's business emerged on October 1, 2018, after the close of trading, when the Company issued a press release announcing its financial results for 4Q18, the period ended July 28, 2018. In the press release, the Company reported 2.7 million active clients, disclosing that its new active client growth had stalled throughout 4Q18. The press release stated as follows:

**Stitch Fix Announces Fourth Quarter and Full Fiscal Year 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for the fourth quarter and full fiscal year 2018 ended July 28, 2018 and posted a letter to its shareholders on its investor relations website.

**Fourth quarter highlights**

- Active clients of 2.7 million, an increase of 25% year over year

- Net revenue of $318.3 million, an increase of 23% year over year

- Net income of $18.3 million and adjusted EBITDA of $11.1 million

- Diluted earnings per share of $0.18

**Full year highlights**

- Net revenue of $1.2 billion, an increase of 26% year over year

- Net income of $44.9 million and adjusted EBITDA of $53.6 million

- Diluted earnings per share of $0.34

"Q4 was another strong quarter for us," said Stitch Fix Founder and CEO, Katrina Lake. "We grew our active client count 25% year over year and delivered $318.3 million in net revenue and $11.1 million in adjusted EBITDA."

36.     During the conference call held with investors later that evening, Stitch Fix reported that its active client growth rate had already dramatically declined and it was only up 54,000 quarter-over-quarter and 548,000, or 25%, year-over-year, and that its active client count still remained at 2.7 million.

37.     Also during the call, defendant Smith stated that the Company had decided to "temporarily cease[] [its] national TV campaign for 10 weeks" during the 13 weeks of 4Q18, purportedly to "measure channel efficacy." Defendant Smith conceded that the decision had had a negative impact on new client growth during the quarter, acknowledging that defendants had "learned that TVE was a more effective acquisition channel than [they] had previously modeled as measured on a cost per acquisition basis."

38.     Later on the call, defendant Lake was asked whether television advertising had "already turned back on," he replied that Stitch Fix had "turned TV back on," expressly acknowledging that "TV is an important part of that portfolio." Later she reiterated that "we always knew that TV was an important component of [marketing], but I think having gone through this test and having really understood more granularly how TV impacts, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there."

39.     Later that same day, *The Wall Street Journal* published an article on Stitch Fix. According to the article, "[w]hen Stitch Fix, a subscription fashion service, had its initial public offering last November, investors were skeptical. How many people would continue to pay for constant wardrobe updates?" The article noted that while "[i]n its first quarters as a public company, Stitch Fix defied the skeptics and posted consistent growth, raising hopes that it could succeed where other subscription

services ha[d]e failed" and causing its stock price to increase by "73% through Monday's close," the "fiscal fourth-quarter results show[ed] that the bullish thesis may be coming apart at the seams." The article concluded that "Stitch Fix's stagnation with its core customer – American women – is a red flag. If it misses again, investors will have good reason to believe it is going the way of Blue Apron Holdings, Birchbox, and other subscription services that soared and then lost their novelty."

40.     On October 2, 2018, William Blair discussed the sharp deceleration in the growth of active clients and the Company's lower than expected 2019 revenue and earnings guidance:

**Greater-Than-Expected Deceleration of Active Clients Overshadows Plans to Launch Internationally**

What You Need to Know

- Active clients grew about 25% year-over-year to roughly 2.7 million. Sequential net adds of roughly 54,000 was lower than the Street estimate of roughly 128,000.

- Revenue slightly missed the Street estimate by less than 1%. Gross profit and EBITDA beat the Street by 2% and 13%, respectively.

- First quarter 2019 guidance was issued below the Street for both revenue and EBITDA.

- Initial fiscal 2019 guidance bracketed the Street for revenue and was below the Street for EBITDA. . . .

- The company announced plans to launch Women's and Men's offerings in the United Kingdom by the end of fiscal 2019.

Stock Thoughts. **Stitch Fix shares are down about 20% in the aftermarket, likely due to greater-than-expected deceleration on active clients and revenue, as well as lower-than expected EBITDA guidance for fiscal 2019.**

41.     On this news, the price of Stitch Fix common stock fell $15.69 per share, greater than 35%, to close at $31.58 per share on October 2, 2018.

1

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

2

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure

3
23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Stitch

4
Fix securities during the Class Period (the "Class"); and were damaged upon the revelation of the

5

6
alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors

7
of the Company, at all relevant times, members of their immediate families and their legal

8
representatives, heirs, successors or assigns and any entity in which Defendants have or had a

9
controlling interest.

10
43.     The members of the Class are so numerous that joinder of all members is impracticable.

11

12
Throughout the Class Period, Stitch Fix securities were actively traded on the NASDAQ.  While the

13
exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through

14
appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

15
proposed Class.  Record owners and other members of the Class may be identified from records

16

17
maintained by Stitch Fix or its transfer agent and may be notified of the pendency of this action by mail,

18
using the form of notice similar to that customarily used in securities class actions.

19
44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of

20
the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

21
complained of herein.

22

23
45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and

24
has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no

25
interests antagonistic to or in conflict with those of the Class.

26

27

28

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Stitch Fix;

•       whether the Individual Defendants caused Stitch Fix to issue false and misleading financial statements during the Class Period;

•       whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

•       whether the prices of Stitch Fix securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

•       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

•       Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Stitch Fix securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Stitch Fix securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

51. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

52. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stitch Fix securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Stitch Fix securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Stitch Fix securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Stitch Fix finances and business prospects.

55. By virtue of their positions at Stitch Fix , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would

reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Stitch Fix, the Individual Defendants had knowledge of the details of Stitch Fix internal affairs.

57.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Stitch Fix.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Stitch Fix businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Stitch Fix securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Stitch Fix business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Stitch Fix securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

58.    During the Class Period, Stitch Fix securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Stitch Fix securities at prices

artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Stitch Fix securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Stitch Fix securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

61.   Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.   During the Class Period, the Individual Defendants participated in the operation and management of Stitch Fix, and conducted and participated, directly and indirectly, in the conduct of Stitch Fix business affairs.  Because of their senior positions, they knew the adverse non-public information about Stitch Fix misstatement of income and expenses and false financial statements.

63.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Stitch Fix financial condition and

results of operations, and to correct promptly any public statements issued by Stitch Fix which had become materially false or misleading.

64.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Stitch Fix disseminated in the marketplace during the Class Period concerning Stitch Fix results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Stitch Fix to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Stitch Fix within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Stitch Fix securities.

65.      Each of the Individual Defendants, therefore, acted as a controlling person of Stitch Fix. By reason of their senior management positions and/or being directors of Stitch Fix, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Stitch Fix to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Stitch Fix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.      By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Stitch Fix.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: October 26, 2018

By:  __*/s/ Jennifer Pafiti*_____
Jennifer Pafiti
**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6449
Email:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS

1.     I, Steven Weissman, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Stitch Fix, Inc. ("Stitch Fix" or the "Company").

3.     I did not purchase or acquire Company securities at the direction of Plaintiff's counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Company securities during the class period, including providing testimony at deposition and trial, if necessary.

5.     To the best of my current knowledge, the attached sheet lists all of my transactions in Company securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have served or sought to serve as a representative party on behalf of a class under the federal securities laws in the following actions:

- *Rosado v. China North East Petroleum Holdings Limited et al.*, C.A. No. 1:10-cv-04577 (S.D.N.Y.)

- *In Re Puda Coal Securities Inc. et al. Litigation*, C.A. No. 1:11-cv-02598 (S.D.N.Y.)

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed _____9/19/18_____
                    (Date)


_____Steven L Weissmann_____
                    (Signature)

_____Steven L Weissmann_____
            (Type or Print Name)

SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 9/18/18 | Purchase | 50 Shares | $50.23 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |